```
                                    ___ FILED
                                    ___ ENTERED    ___ RECEIVED
                                                   ___ SERVED ON
                                    COUNSEL/PARTIES OF RECORD

                                        MAY 1 1 2012

                                    CLERK US DISTRICT COURT
                                    DISTRICT OF NEVADA
                              BY: _____
                                               ___ DEPUTY
```

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JESS C. ARNDELL and SUZANNE K. ARNDELL,

        Plaintiffs,

      v.

ROBISON, BELAUSTEGUI, SHARP & LOW, et al.,

        Defendants.

3:11-cv-469-RCJ-VPC

**ORDER**

Currently before the Court is Defendants' Motion to Dismiss or, in the Alternative, Motion to Strike Plaintiffs' Duplicative Claims (#8). The Court heard oral argument on March 19, 2012.

**BACKGROUND**

In July 2011, then *pro se* Plaintiffs Jess C. Arndell ("Arndell") and Suzanne K. Arndell (collectively "Plaintiffs") filed a complaint against Defendants Robison, Belaustegui, Sharp & Low; Kent R. Robison; Thomas L. Belaustegui; F. DeArmond Sharp; Keegan G. Low; and Mark G. Simons (collectively "Defendants") in this Court based on diversity jurisdiction.[1] (Compl. (#1) at 1, 3). Plaintiffs were assignees of all claims that Hidden Meadows Company aka Hidden Meadows, Ltd aka Hidden Meadows, LLC aka Hidden Meadows Corporation (collectively "HMC") and Jess Arndell Construction Co., Inc. aka Jess Arndell Construction Company, Inc. aka Jess Arndell Construction Company (collectively "JACC") may have had against any and all of the Defendants. (*Id.* at 2).

---

[1] Plaintiffs are citizens of Truckee, California, and Defendants are citizens of Nevada. (Compl. (#1) at 1-2).

1    The complaint alleged the following. From December 2000 to the date of the complaint,

2    the law firm of Robison, Belaustegui, Sharp & Low (hereinafter "the Law Firm") had

3    represented Arndell (individually), HMC, and JACC in various matters including a real estate

4    project known as the Hidden Meadows Housing Development. (*Id.* at 3). In 2004, HMC and

5    JACC completed the development which consisted of 101 single family homes. (*Id.*).

6    The complaint alleged that a civil engineering firm called Stantec aka SEA ("SEA") had

7    been the civil engineer for the first phase of construction. (*Id.*). Because the county forbade

8    the import of fill soil for the project, SEA recommended that HMC and JACC utilize a borrow

9    site and a nearby slough located on the project to obtain soil to accomplish the original mass

10   grading. (*Id.*). The site eventually became a 17-acre retention pond directly adjacent to the

11   development. (*Id.*). During construction it became apparent that there was insufficient soil

12   quantity and quality to complete construction as designed by SEA. (*Id.* at 4). To cover up its

13   flawed analysis, SEA recommended that Arndell dig deeper into the borrow site to obtain more

14   soil resulting in an unplanned 17-acre retention pond where the original plan called for a multi-

15   purpose park. (*Id.*). As a result of SEA's fraudulent conduct, HMC incurred over $11,000,000

16   in debt to JACC. (*Id.*). JACC had expended the sums on behalf of HMC in an attempt cure

17   the deficiencies of SEA's fraudulent geo-technical report. (*Id.*). As a result, HMC, through its

18   attorneys at the Law Firm, filed a lawsuit against SEA over the soil deficiencies (hereinafter

19   "Dirt Suit"). (*Id.*).

20   The complaint alleged that during the Dirt Suit, Mark Simons was lead counsel and Kent

21   Robison was the supervisory attorney. (*Id.*). The attorneys advised Arndell that he had a

22   strong case against SEA, that his damages were easily verified, and that the fraud was

23   obvious. (*Id.* at 4-5). Arndell and his entities spent $10,000,000 on the litigation. (*Id.* at 5).

24   On January 4, 2003, two days before the Dirt Suit trial was to commence, a settlement

25   conference was held. (*Id.*). Arndell and his daughter were shocked when Mark Simons

26   recommended that they accept SEA's first offer of $75,000. (*Id.*). Simons told Arndell that

27   Arndell had to accept the offer because Arndell owed the Law Firm $90,000 due in overdue

28   attorney's fees and that the Law Firm was not prepared to go to trial. (*Id.*). Simons told Arndell

2

1   that Arndell needed to come up with an additional $250,000 immediately to cover the Law

2   Firm's attorneys' fees to try the case. (*Id.*).

3        The complaint alleged that SEA eventually increased their settlement offer to

4   $1,450,000. (*Id.*). Arndell refused to accept that offer because he knew that it would mean

5   bankruptcy for himself, HMC, and JACC. (*Id.*). The Law Firm applied inappropriate pressure

6   and contacted Arndell's wife, Suzanne, without Arndell's permission in an attempt to influence

7   Arndell's business judgment. (*Id.* at 5-6). Thirty days after the settlement conference, the Law

8   Firm summoned Arndell to its offices. (*Id.* at 6). Simons and Robison told Arndell that he had

9   to accept the terms of the settlement agreement because they had already told SEA's counsel

10  that Arndell had accepted the $1,450,000 at the settlement conference, thirty days prior. (*Id.*).

11  Simons and Robison also told Arndell that the case had been taken off the trial calendar when

12  they had told SEA that Arndell had accepted the offer at the settlement conference. (*Id.*).

13  Simons and Robison stated that they were not prepared for trial. (*Id.*). At that meeting,

14  Simons and Robison told Arndell that, as part of the settlement, he had to agree "to an

15  indemnification by HMC of any future claims that might be asserted by any party against SEA

16  related to the Hidden Meadows development." (*Id.*). The Law Firm represented to Arndell that

17  his part of the settlement would not harm HMC, JACC, or himself personally because HMC

18  was judgment proof and indemnification would only apply to HMC. (*Id.* at 6-7). The Law Firm

19  and Arndell were aware of the pending litigation by various homeowners in the development

20  due to design defects caused by SEA's fraudulent geo-technical report. (*Id.* at 7). On

21  February 26, 2003, the parties signed the settlement agreement for the Dirt Suit. (*Id.*).

22        The complaint alleged that, in November 2003, 71 homeowners had filed defect

23  lawsuits against HMC and JACC. (*Id.*). In that lawsuit, a judge ruled that Arndell, JACC, and

24  HMC were alter egos of one another and that the indemnification agreement had precluded

25  Arndell and JACC from pursuing cross-claims against SEA in the defect suit. (*Id.*). As a direct

26  result of the alter ego and indemnification ruling, Arndell and JACC paid out over $5,000,000

27  in claims that should have been paid out by SEA. (*Id.*). JACC's contractor's license was

28  revoked after its financial stability was severely damaged. (*Id.*). Arndell's income had been

3

1   about $200,000 annually and was now "virtually nothing." (*Id.*).

2       The complaint alleged that the Law Firm had a conflict of interest when it had

3   represented Arndell and his entities in the Dirt Suit litigation. (*Id.* at 8). The Law Firm did not

4   suggest that Arndell, HMC, or JACC obtain separate counsel or recommend that they obtain

5   a second opinion. (*Id.* at 10). After Arndell consulted with independent counsel, he learned

6   of the Law Firm's "egregious conduct." (*Id.*). Arndell has requested copies of his files,

7   accounting of the attorneys' fees that he had paid, and fees paid out by various insurers to see

8   if double payments have occurred. (*Id.*). The Law Firm has refused all requests. (*Id.*).

9       Plaintiffs alleged ten causes of action: (1) breach of fiduciary duty; (2) common law

10   negligence, lack of skill and diligence and failure to use reasonable skill and diligence; (3) self-

11   dealing; (4) misrepresentation; (5) undue influence; (6) fraud; (7) intentional harm, willful

12   neglect and unethical conduct due to Defendants' refusal to communicate with Plaintiffs, and

13   provide requested documents and an accounting; (8) abandonment; (9) settling litigation

14   without clients' authority; and (10) exemplary damages. (*Id.* at 10-20).

15                                       **DISCUSSION**

16       Defendants file a motion entitled a "motion to dismiss or, in the alternative, motion to

17   strike Plaintiffs' duplicative claims." (Mot. to Dismiss (#8) at 1). However, the motion really

18   seeks to consolidate all ten claims into one single claim for legal malpractice. (*Id.* at 4, 6-7).

19       In response, Plaintiffs, now counseled, argue that the Court should deny the motion.

20   (Resp. to Mot. to Dismiss (#11-1) at 5).[2] However, they agree that all of their claims, except

21   for three, do set forth specific acts of legal malpractice and are willing to re-plead their

22   complaint to have one umbrella count for legal malpractice. (Resp. to Mot. to Dismiss (#11)

23   at 4). Plaintiffs assert that their claims for fraud, misrepresentation, and exemplary damages

24   should remain as separate counts. (*Id.*; Resp. to Mot. to Dismiss (#11-1) at 2, 4).[3]

25

26       [2] The complete response is filed in two parts under docket entries #11 and #11-1.

27       [3] Plaintiffs also hypothesize that Defendants will later try to raise a statute of limitations

28   argument. (Resp. to Mot. to Dismiss (#11) at 3-4). Because that issue is not before the Court
at this time, this order does not address that argument.

1    In reply, Defendants assert that Plaintiffs' claims for misrepresentation, fraud, and
2    exemplary damages are not separate and distinct causes of action and are part of the legal
3    malpractice claim. (Reply to Mot. to Dismiss (#12) at 4).  Defendants argue that exemplary
4    damages is a remedy and not a cause of action. (*Id*.).  Defendants assert that Plaintiffs'
5    misrepresentation and fraud claims state that those actions took place during Defendants'
6    representation of Plaintiffs and, thus, are part of the legal malpractice claim. (*Id*.).

7         In *Stalk v. Mushkin*, 199 P.3d 838, 842 (Nev. 2009), the Nevada Supreme Court
8    reached a statute of limitations issue by first addressing the "true nature" of a claim. *Id*.
9    There, the Nevada Supreme Court classified a party's breach of fiduciary claim as one for
10   legal malpractice because the claim was grounded on allegations that the lawyer-defendant
11   had "breached certain duties, namely, confidentiality and loyalty, that would not exist but for
12   the attorney-client relationship." *Id*. at 843. The Nevada Supreme Court held that "claims for
13   breach of fiduciary duty arising out of an attorney-client relationship are legal malpractice
14   claims subject to NRS § 11.207(1)'s limitation period, and claims for breach of fiduciary duty
15   based on fiduciary relationships other than attorney-client are akin to fraud claims, subject to
16   the limitation period set forth under NRS § 11.190(3)(d)." *Id*. at 844.

17        In this case, Plaintiffs nine substantive claims are, in essence, one claim for legal
18   malpractice because they are all based on actions that took place during and because of the
19   attorney-client relationship. Additionally, the fraud and misrepresentation claims also rely on
20   the actions that took place during and because of the attorney-client relationship. (*See* Compl.
21   (#1) at 13-16).  As such, all nine substantive claims are one legal malpractice claim.
22   Moreover, Defendants are correct that exemplary damages are a remedy and not a separate
23   cause of action. *See generally* NRS § 42.005 (explaining the limitations on exemplary and
24   punitive damages). As such, the Court grants Defendants' motion to the extent that it seeks
25   to consolidate all nine substantive claims into one claim for legal malpractice and denies
26   Defendants' motion to the extent that it seeks to strike or dismiss any of the claims from the
27   lawsuit (#8).

28   ///

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that Defendants' Motion to Dismiss or, in the Alternative, Motion to Strike Plaintiffs' Duplicative Claims (#8) is GRANTED in part and DENIED in part.  The Court GRANTS the motion to the extent that it seeks to consolidate Plaintiffs' nine substantive claims into one claim for legal malpractice and DENIES the motion to the extent that it seeks to dismiss any of Plaintiffs' claims from the lawsuit.

IT IS FURTHER ORDERED that Plaintiffs have 30 days from the date of this order to file an amended complaint.


DATED: This 11th day of May, 2012.

_____
United States District Judge

6