CHARLES R. KOZAK, ESQ.
Nevada State Bar #11179
1225 Tarleton Way
Reno, Nevada 89523
(775) 622-0711
kozak131@charter.net
Attorney for the Plaintiffs

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

JESS C. ARNDELL and
SUZANNE K. ARNDELL,               )
                                  )
                    Plaintiffs,   )          Case No.  3:11-cv-00469
                                  )
vs.                               )
                                  )     **FIRST AMENDED**
ROBISON, BELAUSTEGUI, SHARP & LOW, a  )  **COMPLAINT & JURY**
Professional Corporation, KENT R. ROBISON,  )  **DEMAND**
THOMAS L. BELAUSTEGUI, F. DeARMOND  )
SHARP, KEEGAN G. LOW, MARK G. SIMONS,  )
And JOHN DOES I-V,                )
                                  )
                    Defendants.   )
_____)

    **COME NOW,** Plaintiffs, JESS C. ARNDELL and SUZANNE K. ARNDELL,

individually, by and through their Attorney of Record, CHARLES R. KOZAK, ESQ., and for

their claims against the Defendants, ROBISON, BELAUSTEGUI, SHARP & LOW, a

Professional Corporation, KENT R. ROBISON, THOMAS L. BELAUSTEGUI, F.

DeARMOND SHARP, KEEGAN G. LOW, MARK G. SIMONS and JOHN DOES I–V,

state as follows:

## PARTIES

1

recommended that HMC and JACC utilize a borrow site at the nearby slough located on the project to obtain soil to accomplish the original mass grading. This site eventually became a 17-acre retention pond directly adjacent to the Hidden Meadows community.

14. During construction it became apparent there was insufficient soil quantity and quality to complete construction as designed by SEA. As a result, HMC filed suit against SEA (hereinafter DIRT SUIT), over these soil deficiencies. SEA's flawed analysis resulted in insufficient quantities and quality of soil in the borrow site to comply with the geotechnical report recommendations. To cover up for their fraud, SEA's recommendation to ARNDELL was to dig deeper into the borrow site to obtain more soil. This resulted in the creation of an unplanned 17-acre retention pond where the original plans called for a multi-purpose park. Also, the soil recovered from the borrow site was not suitable for fill to support some of the development's housing foundations. During the course of the litigation it became evident that SEA was well aware of the deficiencies in their report to HMC, but intentionally concealed this information. In retrospect, it was clear from the outset that the Hidden Meadows project should never have been built, and in fact never would have been attempted by HMC had these deficiencies been timely disclosed to JESS ARNDELL and his entities, HMC and JACC.

15. As a direct result of the fraudulent conduct of SEA, HMC incurred over Eleven Million Dollars ($11,000,000.00) in debt to JACC. JACC expended these sums on behalf of HMC in attempting to cure the deficiencies of SEA's fraudulent geotechnical report. JACC had no choice but to bill these costs to HMC. RLF filed the DIRT SUIT on behalf HMC against SEA, seeking recovery of the Eleven Million Dollars ($11,000,000.00) HMC now owed JACC. All the while, RLF continued to represent and advise HMC, JACC and JESS

4

ARNDELL personally, all at the same time, as RLF had always done prior to filing suit on

behalf of HMC.

16. MARK SIMONS was lead counsel, with supervisory assistance from KENT

ROBISON. ARNDELL was advised by them that he had a strong case against SEA,

and that in fact, it was a "Slam Dunk". The damages were easily verified. The fraud was

obvious because the original geotechnical report called for a multi-purpose park to exist

where the large 17-acre retention pond now sits. Further, SEA, as the civil engineer on the

project failed to make recommendations such as installing area drains on each lot which

would have mitigated their earlier fraudulent geotechnical report. The result of this failure

was to cause a subsequent lawsuit to be filed by seventy-one (71) homeowners (hereinafter

the DEFECT SUIT) who experienced standing water in their crawl spaces, as well as

problems related to the quality of soils ordered by SEA to be used in construction. This

litigation eventually cost JESS ARNDELL and his entities an additional Ten Million Dollars

($10,000,000.00).

17. Two days before the trial against SEA was scheduled to commence on January 4,

2003, a Settlement Conference was held. ARNDELL and his daughter, KIM ARNDELL,

HMC's Financial Manager, attended. ARNDELL and his daughter were shocked when their

attorney, SIMONS, recommended that SEA's first offer of Seventy Thousand Dollars

($70,000.00) be accepted. SIMONS told ARNDELL that he must accept the offer because

ARNDELL owed RLF Ninety Thousand Dollars ($90,000.00) in overdue attorney's fees.

SIMONS further stated that RLF was not prepared for trial, and that ARNDELL needed to

come up with an additional Two Hundred Fifty Thousand Dollars ($250,000.00) immediately

in order to cover RLF's attorney's fees to try the case.  Eventually, SEA increased their offer to One Million Four Hundred Fifty Thousand Dollars ($1,450,000.00).  ARNDELL continued to refuse even that amount because he knew it meant certain bankruptcy for himself personally as well as HMC and JACC.  RLF persisted in applying inappropriate pressure, including at one point having ROBISON call SUZANNE ARDNELL without JESS ARDNELL'S permission, in order to improperly influence JESS ARDNELL'S business judgment.

18. The Settlement Conference ended with no resolution to ARDNELL'S understanding, although SIMONS was still strongly recommending acceptance of the One Million Four Hundred Fifty Thousand Dollars ($1,450,000.00) amount.  Approximately thirty (30) days later ARDNELL was summoned to the RLF office.  SIMONS and ROBISON informed ARDNELL that he must accept the terms of the agreement because SIMONS and ROBISON had already informed SEA's counsel that ARDNELL had accepted the One Million Four Hundred Fifty Thousand Dollars ($1,450,000.00) amount at the Settlement Conference thirty (30) days prior.  They repeated their demand for past and future attorney's fees.  They also stated that the case could no longer be tried because it had been taken off the calendar when the settlement had been agreed to between Counsel, even though JESS ARDNELL had never agreed to it.  They reiterated they were not prepared for trial.

19. ARDNELL was also informed at this meeting that even if he obtained a large judgment, SEA would appeal and it would take years to obtain the money.  Furthermore, there was no explanation as to why RLF was not prepared for trial, the odds for success versus failure if the case went to trial, or the strengths and weaknesses of SEA's defenses. Nor did

these attorneys answer ARDNELL'S direct questions related to the possible award of post

judgment interest or attorney's fees in the event of an appeal.

20. At this meeting, ARDNELL was first informed that he must agree to an additional

settlement condition. He was expected to agree to an indemnification by HMC of any future

claims that might be asserted by any party against SEA related to the Hidden Meadows

development. RLF represented to ARDNELL that this would not harm HMC, JACC or

ARDNELL personally because HMC was judgment proof and the indemnification would

apply to HMC only. Again, undue influence and inappropriate pressure were used to obtain

ARDNELL'S agreement to this additional condition. As an inducement to obtain

ARDNELL'S consent, SIMONS represented that he would defend against its application to

JACC or ARDNELL personally. At that time, RLF and ARDNELL were aware of pending

litigation by various homeowners in the development due to design defects caused by SEA's

fraud in the geotechnical report and ARDNELL'S concern that he preserve any and all cross

claims by JACC, HMC and himself personally, against SEA in the pending DEFECT SUIT.

21. The DIRT SUIT settlement was signed on February 26, 2003. RLF, through

SIMONS, continued to represent ARDNELL, JACC and HMC, apparently without

cognizance of the blatant conflict of interest in doing so. By November, 2003, certain

homeowners had served notice pursuant to NRS Chapter 40 of defects in three (3) residences,

against HMC and JACC. Eventually, seventy-one (71) homeowners filed similar suits.

During the litigation, the Judge ruled that ARDNELL, JACC, and HMC were alter egos of

one another. SIMONS surprisingly provided in court testimony that supported this finding.

Thus, the indemnification agreement precluded ARDNELL and JACC from pursuing cross

claims against SEA in the DEFECT SUIT, even though SEA was the real party at fault.

22. The direct result of the alter ego ruling and indemnification ruling was that JACC and ARNDELL personally paid out over Five Million Dollars ($5,000,000.00) in claims that should have been paid by SEA. JACC's financial stability was so severely damaged that its Contractor's License was revoked. JACC is now insolvent. JESS ARNDELL'S income has gone from approximately Two Hundred Thousand Dollars ($200,000.00) annually to virtually nothing. JESS and SUZANNE ARNDELL have suffered severe physical and emotional distress as a direct result of this loss of income, all of which was directly caused by the errors and omissions of RLF including but not limited to ROBISON and SIMONS.

23. RLF had a serious conflict of interest when they represented all three ARNDELL entities in the DIRT SUIT litigation. JACC was a creditor of HMC. JACC was a financially viable construction company with a substantial net worth. HMC was bankrupt and owed JACC millions of dollars. By settling HMC's claim against SEA for less than ten percent (10%) of its actual worth, RLF jeopardized JACC's financial stability and eventually brought about its insolvency. RLF should have withdrawn from the joint representation of HMC, JACC and ARNDELL personally, well before the DIRT SUIT settlement negotiations commenced. In addition, the facts strongly suggest that RLF was self-dealing at the Settlement Conference and only wished to recover sufficient money to get their own attorney's fees paid, regardless of the financial ruin such a meager settlement would cause for their clients.

24. RLF settled HMC's claims against SEA at the Settlement Conference without authorization from ARNDELL. Thirty (30) days later ARNDELL was unequivocally

informed of this unauthorized action by RFL attorneys in RLF's offices. At this point, RLF

had a duty to withdraw as Counsel for ARNDELL, HMC and JACC, and advise them to seek

other and separate Counsel. Instead RLF used undue influence and misrepresentations to

"bully" ARNDELL into accepting the One Million Four Hundred Fifty Thousand Dollars

($1,450,000.00) settlement and concealed their own gross negligence, malfeasance,

misfeasance and self-dealing.

25. RLF attorneys breached their duty to use reasonable skill and diligence in preparing

the DIRT SUIT for trial. This was a liquidated claim with clear liability and with a defendant

capable of paying the full provable claim of Eleven Million Dollars ($11,000,000.00). The

entire financial future of ARNDELL and his companies had been placed in the hands of RLF.

Up to a few days before Trial ARNDELL had been informed that the case was going well.

He was justifiably shocked to have his attorneys recommend acceptance of the Defendants'

opening offer of Seventy Thousand Dollars ($70,000.00). This conduct is malpractice *per se*.

Numerous inappropriate actions and misrepresentations were used at the Conference to exert

undue influence on ARNDELL in order to obtain his consent to a disastrous and ill-advised

settlement agreement.

26. After RLF had approved the settlement agreement without ARNDELL'S consent,

they aggravated the situation by agreeing to provide SEA with an indemnification provision.

Again, no consent was obtained from ARNDELL at the time this was agreed to by RLF and

SEA's Counsel. The terms of the indemnification agreement required HMC to hold SEA

harmless from all future litigation against SEA associated in any way with the Hidden

Meadows Development. At the time, it was clear that litigation was about to be commenced by various homeowners for construction defects caused by SEA's fraudulent geotechnical plan. Ultimately, misrepresentations as to the effect of this indemnification agreement and RLF's willingness to defend it in Court were used to get ARNDELL'S signature on the settlement agreement.

27. Eventually, seventy-one (71) homeowners filed suit for water accumulating in their crawl spaces as well as several claims for house settlement defects. Contrary to what RLF represented to ARNDELL, after the adverse alter ego ruling, in part aided by the direct testimony of SIMONS, the indemnification agreement resulted in the loss of all cross claims by ARNDELL, HMC and JACC against SEA. Thus, ARNDELL and his entities were forced to pay over Five Million Dollars ($5,000,000.00) in attorney's fees and damages as a direct result of RLF's malfeasance and misrepresentations.

28. Despite all of the serious, continuing conflicts of interest described above, RLF continued to represent ARNDELL and his entities with similar negative results to the present day. Not once during this period did RLF disclose their misconduct in any regard, or suggest that ARNDELL, HMC and JACC obtain other and separate Counsel. Nor did they recommend ARNDELL obtain a second opinion regarding the ethicality or competency of their advice. It was only after ARNDELL, on his own initiative, decided to consult with independent Counsel that he had any understanding of the egregious conduct of RLF during almost the entire course of his attorney-client relationship with them.

29. ARNDELL has requested copies of his files from RLF on numerous occasions. He has requested an accounting for attorney's fees he paid personally, and fees paid by various

insurers to see if double payments occurred.  All requests have been refused.

## COUNT I
## LEGAL MALPRACTICE

30.  Plaintiffs incorporate by reference herein, all statements and allegations in Paragraphs 1 through 29 as if set forth in full herein.

31.  Defendants' acts and omissions set forth in said Paragraphs 1 through 29 constitute legal malpractice in the following regards:

32.  As a result of said breaches of fiduciary duty, Plaintiffs have been injured as set forth in Paragraphs 1 through 29.

33.  The breaches of fiduciary duty described herein were the proximate causes of all damages sustained by Plaintiffs.

34.  The failure to use reasonable skill and diligence, duly described herein, were the proximate causes of all damages sustained by Plaintiffs.

35.  The self-dealing on the part of the Defendants, duly described herein, were the proximate cause of all damages sustained by Plaintiffs.

36.  The Misrepresentation on the part of the Defendants, duly described herein, was the proximate cause of all damages sustained by Plaintiffs.

37.  The undue influence on the part of the Defendants, duly described herein, was the proximate cause of all damages sustained by Plaintiffs.

38.  The Defendants' fraud, duly described herein, was the proximate cause of all damages sustained by Plaintiffs.

39.  The intentional harm, willful neglect, and unethical conduct on the part of the Defendants due to their refusal to communicate with the Plaintiffs, duly described herein, was

the proximate cause of all damages sustained by Plaintiffs.

40.  Abandonment of the Plaintiffs by the Defendants, duly described herein, was the proximate cause of all damages sustained by Plaintiffs.

41.  Defendants settling the case without the Plaintiffs' (their clients) authority, as duly described herein, was the proximate cause of all damages sustained by Plaintiffs.

42.  Plaintiffs have suffered, among other damages, all items of damage recoverable by statute, the common law or otherwise, including but not limited to past, present and future financial ruination, past, present and future mental and physical anguish, lost business opportunities, loss of business licenses and loss of the lifestyle to which they had become accustomed before Defendants breached their fiduciary duties.

**WHEREFORE**, Plaintiffs, JESS C. ARNDELL and SUZANNE K. ARNDELL, jointly and severally, pray for judgment against all Defendants for such actual damages as are fair and reasonable in excess of Seventy-five Thousand Dollars ($75,000.00) for and pertaining to the damages suffered due to each of said Defendants' legal malpractice all as set forth hereinabove, as well as Plaintiffs' costs expended herein, together with interest (including pre-judgment interest), attorney's fees and for such other and further relief as the Court deems just and equitable in the premises.

<u>**COUNT II**</u>
<u>**REQUEST FOR AN ACCOUNTING**</u>
<u>**(LEGAL MALPRACTICE)**</u>

43. Plaintiffs incorporate by reference herein, all statements and allegations in Paragraphs 1 through 42 as if set forth in full herein.

44. During the entire duration of any representation of Plaintiffs by Defendants as set

forth above, Defendants and each of them had fiduciary relationships with Plaintiffs and fiduciary duties to treat Plaintiffs fairly with respect to monies owed to or from Plaintiffs.

45. During the course of the various legal matters which Defendants were handling for Plaintiffs, all as set forth above, monies, payments and/or reimbursements were received by Defendants from various sources, including, but not limited to Plaintiffs' insurance companies and others, which monies should have been transmitted in full or in part by Defendants to Plaintiffs.

46. Further, Plaintiffs made various and substantial payments to Defendants for fees and expenses on all of the matters for which Defendants represented Plaintiffs and Plaintiffs are entitled to an accounting for all of these payments.

47. Over the last year-and-one-half, despite repeated requests for the same from Defendants, Defendants have refused to communicate in good faith with Plaintiffs or provide them with their statutorily mandated copy of all files handled by Defendants for Plaintiffs. What replies Defendants have made have been extremely limited, arrogant and evasive. Only after Defendants erroneously thought the statute of limitations had run on Plaintiffs being able to file a malpractice case against Defendants did Defendants produce files to Plaintiffs. However, said files are not complete in that financial information described in this Count II was missing in whole or in part, and Plaintiffs believe that additional files such as with regard to SUNSET BLUFFS DEVELOPMENT have not been produced by Defendants.

48. Defendants have also, despite repeated requests by Plaintiffs, refused to give them an accounting for all financial information on each of their files including what funds Defendants received from various insurance companies or other sources which in whole or in

13

part should have been remitted by Defendants to Plaintiffs, and whether Defendants billed Plaintiffs for work done for them despite having been previously paid for said work by Plaintiffs' insurance companies.

49. Plaintiffs are entitled to a full financial accounting with regard to all matters handled for them by Defendants so an accurate determination can be made as to any balance due Plaintiffs by Defendants.

50. As such, the acts and omissions described in this count constitute a continuous course of intentional harm, willful neglect of Defendants' duties to Plaintiffs as well as unethical conduct, and Defendants should be required to account for all missing files or parts thereof and provide a financial accounting to Plaintiffs with regard to all financial information of any kind whatsoever related to any matters on which Defendants represented Plaintiffs in any capacity.

**WHEREFORE**, Plaintiffs, JESS C. ARNDELL and SUZANNE K. ARNDELL, jointly and severally pray that the Court order Defendants to provide to Plaintiffs all of their files or parts thereof which have not previously been accounted for or produced to Plaintiffs. Further, Plaintiffs pray that the Court order Defendants to provide Plaintiffs with an accounting of all monies received on Plaintiffs' cases from any sources whatsoever and that if a balance is due Plaintiffs, that Defendants be ordered to immediately remit said balance to Plaintiffs. Further, Plaintiffs pray that the Court award Plaintiffs all interest as provided by law on any balance due Plaintiffs along with Plaintiffs' costs and attorneys fees incurred in pursuing this cause of action and for such other and further relief as the Court deems just and equitable in the premises.

## COUNT III
## EXEMPLARY DAMAGES

51. Plaintiffs incorporate by reference herein, all statements and allegations in Paragraphs 1 through 50 as if set forth in full herein.

52. The acts and omissions of Defendants as set forth in said Paragraphs 1 through 50 constitutes such wanton, reckless, egregious, willful, malevolent and intentional conduct so as to warrant imposition of exemplary damages.

**WHEREFORE**, Plaintiffs, JESS C. ARNDELL and SUZANNE K. ARNDELL, jointly and severally pray that should the jury, after awarding Plaintiffs compensatory damages, determine that any of the Defendants' conduct was so wanton, reckless, egregious, willful, malevolent or intentional so as to warrant an award of exemplary damages, that the Court direct the jury to make an award of such damages, as well as Plaintiffs' costs expended herein,  together with interest (including pre-judgment interest), attorney's fees and for such other and further relief as the Court deems just and equitable in the premises.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

**RESPECTFULLY SUBMITTED THIS** 30th  day of May, 2012.


/s/ **Charles R. Kozak**
CHARLES R. KOZAK, ESQ.
Nevada State Bar #11179
1225 Tarleton Way
Reno, Nevada 89523
(775) 622-0711
kozak131@charter.net
Attorney for the Plaintiffs

**VERIFICATION**

STATE OF NEVADA      )
                     )  ss.
COUNTY OF WASHOE  )

JESS C. ARNDELL & SUZANNE K. ARNDELL, under penalties of perjury being first duly sworn, depose and say: That they are the Plaintiffs in the above-entitled action, and have read the First Amended Complaint, that the same is true of their own knowledge, except for those matters therein contained stated upon information and belief, and as to those matters they believe it to be true.

JESS C. ARNDELL                         SUZANNE K. ARNDELL

SUBSCRIBED and SWORN to before me
this 30th day of May, 2012

NOTARY PUBLIC

> SANDRA R. DESILVA
> Notary Public State of Nevada
> No. 99-7779-2
> My Appt. Exp. August 29, 2015

**ACKNOWLEDGMENT**

STATE OF NEVADA        )
                       )  ss
COUNTY OF WASHOE    )

On this 30th day of May, 2012, personally appeared before me, JESS C. ARNDELL & SUZANNE K. ARNDELL, proven to me to be the persons whose names are subscribed to the above instrument, and who acknowledged to me that they executed the foregoing First Amended Complaint.

NOTARY PUBLIC

> SANDRA R. DESILVA
> Notary Public State of Nevada
> No. 99-7779-2
> My Appt. Exp. August 29, 2015

16

## CERTIFICATE OF SERVICE

I, SANDI DeSILVA,  certify that on the _30th_ day of May, 2012, I caused to be delivered by :

_____   MESSENGER SERVICE

_____   FASCIMILE to the following number:_____

XXX__   U.S. MAIL

_____   CERTIFIED MAIL, RETURN RECEIPT REQUESTED

_____   FEDERAL EXPRESS or other overnight delivery

A true and correct copy of the within document: **FIRST AMENDED COMPLAINT &** **JURY DEMAND**, Case #3:11-cv-00469, addressed as follows:

JOSEPH P. GARIN, ESQ.
STEPHEN G. KEIM, ESQ.
LIPSON, NEILSON, COLE
SELTZER & GARIN, PC
9080 W. Post Road, Ste. 100
Las Vegas, Nevada 89148

**/s/ Sandi DeSilva**
SANDI DeSILVA

17